1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - X
3
    UNITED STATES OF AMERICA,    :   12-CR-634(DLI)
4                                :
                                 :   U.S. Courthouse
5                                :   Brooklyn, New York
        -against-               :
6                                :   TRANSCRIPT OF
                                 :   PROCEEDINGS
7                                :
                                 :
8    TROY STEVENS, JR.,          :   December 2, 2013
                                 :   2:30 p.m.
9          Defendant.            :
                                 :
10   - - - - - - - - - - - - - - X

11  BEFORE:
              HONORABLE DORA L. IRIZARRY, U.S.D.J.
12
    APPEARANCES:
13
    For the Government:      LORETTA E. LYNCH, ESQ.
14                           United States Attorney
                             271 Cadman Plaza East
15                           Brooklyn, New York 11201
                             BY:  MARTIN COFFEY, ESQ.
16                               Assistant U.S. Attorney

17

18  For the Defendant:      JOSEPH CONWAY, ESQ.

19

20  Also Present:           U.S. Probation Officer Shayna Bryant

21

22  Court Reporter:      Holly Driscoll, CSR
                         Official Court Reporter
23                       225 Cadman Plaza East
                         Brooklyn, New York 11201
24                       (718) 613-2274

25  Proceedings recorded by mechanical stenography, transcript
    produced by Computer-Assisted Transcript.

2

1           THE CLERK:  Criminal cause for sentencing, docket

2    number 12-CR-634, United States versus Troy Stevens, Jr.

3           Counsel, please state your appearances.

4           MR. COFFEY:  Martin Coffey for the government.  Good

5    afternoon, Your Honor.

6           THE COURT:  Good afternoon.

7           For Probation?

8           PROBATION OFFICER:  Shayna Bryant, U.S. Probation.

9    Good afternoon.

10           THE COURT:  Good afternoon.

11           For the defendant?

12           MR. CONWAY:  Good afternoon, Your Honor, it is

13    Joseph Conway on behalf of Troy Stevens who is seated to my

14    right.

15           THE COURT:  Good afternoon.  Good afternoon,

16    Mr. Stevens.  And you can remain seated.  Thank you.

17           And I gather these are family members here to my

18    right.

19           MR. CONWAY:  Yes, in the first row, Your Honor.

20           THE COURT:  Okay.  Good afternoon to all of you, to

21    all of our members in the audience.

22           Is Mr. Safran here?

23           MR. COFFEY:  Yes, he is.

24           MR. SAFRAN:  Yes, I am, Your Honor.

25           THE COURT:  Good afternoon, sir.  I know that you

3

1   want an opportunity to be heard and at the appropriate moment

2   we'll give you that opportunity.

3            MR. SAFRAN:  Thank you, Your Honor.

4            THE COURT:  Okay.  And I am going to ask everyone

5   please to remain seated and be sure speak into the

6   microphones, make sure that they are on so that everyone

7   including our members in the audience can hear the

8   proceedings.

9            Now, it is my practice before we start dealing in

10  any substantive way with the issues that have to be dealt with

11  during the sentencing proceeding to place on the record

12  everything that I've received and considered with respect to

13  sentencing and describe how we're going to proceed thereafter.

14  And I like to put on the record what I have received and

15  considered because this way the parties are assured that,

16  indeed, I have received everything that I should have received

17  and considered and also the parties are assured that they also

18  have received everything that they should have received or

19  that I have received and considered I should say.

20           Next, to the extent that there are any outstanding

21  objections to the presentence report, I will resolve those

22  and, as I am required to do under the current state of federal

23  sentencing law, as a first step I must, of course, determine

24  what the appropriate sentencing guideline range is in this

25  case.  The guidelines are advisory, I recognize that,

4

1   nevertheless, consideration of the guidelines and a

2   determination of the range is an initial step that the Court

3   must take before proceeding to consider other factors

4   including any departures that may be warranted under the

5   advisory guidelines either above or below the guideline range

6   and 3553(a) factors which I'm sure we will discuss more during

7   this proceeding and in that regard I will give the attorneys

8   an opportunity to address the Court.

9           Mr. Stevens, the law gives you the right to make a

10  statement to the Court and after I've heard from counsel, I'll

11  give you that opportunity to address the Court if you do wish

12  to make such a statement.  I recognize that you have submitted

13  a letter to the Court, I acknowledge that, and then after that

14  I will impose sentence.

15          So, in connection with the sentencing, of course,

16  there is a forfeiture order that had previously been endorsed

17  by the Court back in May of this year.  There is the

18  presentence report and the sentence recommendation from

19  Probation which was disclosed on August 29th of 2013.  There

20  is the government's letters of objections dated September 11th

21  of 2013.  I note that there apparently had been an objection

22  letter dated September 10th that had been submitted to

23  Probation.

24          My standard requirements in criminal cases,

25  Mr. Conway, which all parties were directed to adhere to,

1    require that a hard courtesy copy be provided to chambers and

2    that was not provided until October 22 of 2013 after the Court

3    made a request for it.

4            There is the government's response to defendant's

5    sentencing submission which is dated September 13th, that is

6    the government's letter is dated September 13th.  I note that

7    there is no response from defense counsel to the government's

8    objections to the presentence report as I require.

9            There is a cover letter from the government dated

10   September 17, 2013 which outlines the attachments; the

11   attachments are some letters between the government and

12   Mr. Safran on behalf of KinPit Associates, and that was a

13   letter from Mr. Safran dated September 12th, the government's

14   response dated September 16th, correspondence from Mr. Safran

15   dated September 16th and September 17th.

16           There is Probation's addendum to the presentence

17   report dated October 9th, I believe, of 2013.  There is

18   defendant's sentencing memorandum with various attachments

19   dated November 12th.  There was an Exhibit 1 but there was no

20   enclosure with respect to Exhibit Number 1.

21           There is a second addendum to the presentence

22   report, that was dated November 18th of 2013.

23           There is the government's sentencing memorandum

24   dated November 20th of 2013.  There were some attachments as

25   well to the government's memorandum which was a letter from

6

1   Mr. Safran dated September 17th and some bank records and some

2   figures.

3           There was a letter addressed to the Court from a

4   Trevor Headley, an attorney apparently from here in Brooklyn,

5   it is a character letter on behalf of the defendant dated

6   November 21, 2013.  I would think that as an attorney who

7   purportedly practices in the federal court he would have known

8   that it was more appropriate for him to send it to the Court

9   through counsel and not ex parte directly to the Court.  The

10   Court had the letter docketed and I certainly don't appreciate

11   getting those submissions so late in the sentencing process.

12           There was the letter dated November 25th, 2013 sent

13   by the government on behalf of KinPit Partnership and

14   Mr. Safran requesting the opportunity to address the Court at

15   sentencing which the Court granted.

16           There was a letter dated November 26, 2013 from the

17   government making an adjustment to the restitution amount as

18   calculated in the November 20th, 2013 letter.  You know, given

19   that we had the Thanksgiving holiday, it is very difficult for

20   the Court to deal with late submissions during a period of

21   time when the Court is not in session.

22           There was a submission that was filed by the defense

23   today at 11 o'clock in the morning, three and a half hours

24   prior to sentencing, as a reply to the government's sentencing

25   memorandum.  Mr. Conway, I don't know whether you ever read my

1    standard requirements in criminal cases.  If you wanted to

2    reply, you should have asked for an adjournment of sentencing

3    and for leave of the Court to file something late, plus you

4    faxed a copy to chambers without permission.

5                    MR. CONWAY:  May I respond, Your Honor?

6                    THE COURT:  I issued an order striking it and, by

7    the way, your presumption that the letter was permissible

8    under Federal Rules of Criminal Procedure 32(i)(1)(B) because

9    it affords a defendant a reasonable opportunity to comment on

10   information provided by the government is incorrect.  Your

11   reliance is misplaced because that rule states that the

12   court must give to a defendant and an attorney for the

13   government a written summary of or summarize in camera any

14   information excluded from the presentence report pursuant to

15   Rule 32(d)(3), and I should note that Rule 32(d)(3) provides

16   for certain specific exclusions, certain matters that are not

17   to be included in the presentence report.  There are only

18   three such specific exclusions.  None of them apply to this

19   case.

20           Moreover, the court should give the parties an

21   opportunity to -- should summarize this information on which

22   the court will rely on sentencing and give the parties a

23   reasonable opportunity to comment on that information.

24   That means information that is subject to exclusion under

25   Rule 32(d)(3), which is not the case here.  This is not what

8

1   we're talking about here because none of what the government

2   said came as a surprise.  The government took the same

3   position that it took in its objections to the presentence

4   report which was consistent with the position that Probation

5   took in the presentence report, that is that KinPit Associates

6   is owed restitution and so all of these arguments could have

7   been made in defendant's sentencing submission ab initio and I

8   don't appreciate the fact that I get this at 11 o'clock in the

9   morning the day of sentencing and you presume that I can give

10  it the attention that it warrants or should warrant like I

11  have nothing else to do all day.  I was in court all morning.

12              MR. CONWAY:  May I respond, Your Honor?

13              THE COURT:  Yes.

14              MR. CONWAY:  A, I meant no disrespect to the Court.

15  My submission this morning is dated November 27th and I was

16  under the impression it was ECF-ed on Wednesday.  When I

17  learned this morning that it was not done by my office, that's

18  when I decided to send it and fax it.

19              THE COURT:  It was late on November 27th,

20  November 27th, the Wednesday before Thanksgiving, and it

21  was not ten days prior to the date of sentencing.

22              MR. CONWAY:  Nor was the government's November 20th

23  letter and that's what I'm responding to.  They filed a letter

24  on November 20th which I received on November 22nd which was

25  Friday, my response was three days later.

1          THE COURT:  You should have asked the Court for

2    permission to file something late so that at least I would

3    have known that it was coming.  November 27th, the day before

4    a holiday, was already too late.

5          MR. CONWAY:  I apologize.

6          THE COURT:  And then you filed it today.

7          MR. CONWAY:  I just explained why but I apologize

8    for the late submission.  If the Court does not want to

9    include it, I understand.

10          THE COURT:  I don't know how you expect for the

11    Court to take a look at any cases cited and any of the

12    arguments with sufficient depth, really.

13          MR. CONWAY:  I understand the Court's position.

14          THE COURT:  Or the government, for that matter,

15    because I don't know what the government was doing at 11

16    o'clock this morning, and Probation should get a copy of it.

17    I highly doubt that Probation even was aware.

18          MR. CONWAY:  It is certainly not a new issue, Your

19    Honor, I raised it in my sentencing papers.  It was flushing

20    out the argument.

21          THE COURT:  Which you could have done initially.

22          MR. CONWAY:  And I apologize that I didn't.

23          THE COURT:  But you cited different cases and made

24    different arguments.

25          That's everything that I have, Mr. Coffey.  Is that

10

1    everything that I should have?

2              MR. COFFEY:  Yes, Your Honor.

3              THE COURT:  Did you even get a chance to read the

4    submission from today?

5              MR. COFFEY:  Yes, I did, Your Honor.

6              THE COURT:  I don't know whether, Ms. Bryant, you

7    had an opportunity to see it, whether you even got a copy of

8    it.

9              PROBATION OFFICER:  I did receive a copy that I

10   downloaded via ECF, that's how I was initially notified this

11   morning by the electronic court filing system, and I did

12   briefly review the letter, as did Mr. Coffey.

13             THE COURT:  The key word being briefly.

14             Is that everything that I should have, Mr. Conway?

15             MR. CONWAY:  Yes, Your Honor.

16             THE COURT:  Mr. Stevens, did you have an opportunity

17   to review all of these documents that I mentioned?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Did you review them with your attorney?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  The question is a simple one, did you

22   review them with your attorney?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Are you familiar with the objections

25   that were made on your behalf by your attorney?

1          Do you understand -- am I not speaking in English?

2  Do you not understand?

3          MR. CONWAY:  He's having trouble hearing.

4          THE COURT:  Then tell me that and I will speak

5  louder.

6          Can you hear me now?

7          THE DEFENDANT:  I hear you now.

8          THE COURT:  Okay.  All right.

9          Do you understand the objections that were raised by

10 your attorney on your behalf?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Okay.  And let us know if there's

13 something you can't hear because you should be able to hear

14 the proceedings, that's why I want people to speak into the

15 microphone, okay.

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Okay.  And aside from the objections

18 that were raised by your attorney, because we'll deal with

19 those, is there anything else in the presentence report that

20 you think is inaccurate that should be corrected?

21         THE DEFENDANT:  No.

22         THE COURT:  Okay.  On the issue of restitution --

23 the issue of restitution aside, obviously there is still some

24 contention about the issue of restitution, are the parties

25 satisfied with the corrections to the presentence report as

12

1   corrected by way of addendum by Probation?

2           MR. COFFEY:  Yes, Your Honor.

3           THE COURT:  Mr. Conway?

4           MR. CONWAY:  Yes, Your Honor.

5           THE COURT:  There are a few things that I did want

6   to address.  There's just -- I think it is a minor typo and

7   correct me if I'm wrong, in paragraph 13, the fifth line down

8   from the beginning of that paragraph, at the end of that line,

9   shouldn't the fund total be 399,000; if we subtract 150 from

10  549, we're talking in the thousands?

11          MR. COFFEY:  Yes.

12          THE COURT:  Okay, so that's corrected.

13          And in paragraph 18 there's reference to guideline

14  2T4.1 it should be but it says 2T41.1, beginning on line four.

15          PROBATION OFFICER:  Yes, Your Honor, we will correct

16  that.

17          THE COURT:  Yes, and that same thing must have been

18  a carryover into paragraph 31.

19          The other thing that perhaps Probation can clarify,

20  the recommended sentence under Count Six is 48 months,

21  however, the maximum sentence is 36 months that's permitted by

22  statute.  I believe the range is zero to three years on the

23  Class E felony.

24          PROBATION OFFICER:  That is correct, Your Honor.

25          THE COURT:  Also, it says three years of supervised

1    release and the maximum on Count Six is one year maximum.

2         PROBATION OFFICER:  The correction will be made, 36

3    months custody and one year supervised release.

4         THE COURT:  One year.

5         Also, this may have been corrected by way of

6    addendum so correct me if I'm wrong please, on the first line

7    of the recommendation, the defendant has been convicted of

8    bank fraud, not bank fraud conspiracy.

9         PROBATION OFFICER:  The correction will be made to

10   the sentencing recommendation, Your Honor.

11        THE COURT:  Yes.  And then on the ninth line down on

12   page two of the recommendation it should read around the

13   middle of that sentence as to Count Two, not Count One.

14        PROBATION OFFICER:  Thank you, Your Honor.

15        THE COURT:  I think everything else has been picked

16   up either by Probation itself or by way of the parties'

17   comments.

18        Is there any outstanding objection to the

19   presentence report as amended both by way of addendum and here

20   in court today?

21        MR. COFFEY:  No, Your Honor.

22        MR. CONWAY:  No, Your Honor.

23        THE COURT:  I did want to note one other thing

24   before I forget and that is because the original presentence

25   report was disclosed in August of this year, it relied

14

1   properly on the 2012 sentencing guideline manual, however,

2   given that there were amendments to the sentencing guidelines

3   that were promulgated and made effective November 1, 2013,

4   which is the manual which the Court has to rely on for

5   sentencing at this juncture, I have reviewed all of the

6   relevant guidelines and there is no change except for one

7   really minor change which does not affect the guidelines

8   calculation at all and that is that the references to the

9   enhancement under 2B1.1(b)(15) is now changed to 2B1.1(b)(16).

10  So, they added another section in between there but the actual

11  enhancement itself remains the same.  So, that's the only

12  difference and perhaps, for sake of clarity, that would be a

13  change in paragraph 17 and the change in paragraph 26.  Other

14  than that, the guidelines basically stay the same.

15          As amended, the Court adopts the presentence report.

16          The parties seem to be in agreement that Probation

17  has properly calculated the sentencing guideline range that

18  is applicable in this case.  I've reviewed the calculations

19  and I too am in agreement with the parties, and that provides

20  for a total offense level of 26 with a Criminal History

21  Category of I; there is a sentencing guideline range of 63 to

22  78 months.  Have I stated that accurately, Mr. Coffey?

23          MR. COFFEY:  Yes, Your Honor.

24          THE COURT:  Mr. Conway?

25          MR. CONWAY:  Yes, Your Honor.

1      THE COURT:  Okay.  So, as I said I would, I'm going

2  to give the parties an opportunity now to address the Court

3  and to address the various factors that the Court should take

4  into consideration with respect to sentencing.  I'll also hear

5  the parties with respect to restitution at this point, and

6  I'll hear from Mr. Stevens and then, Mr. Safran, I'll give you

7  an opportunity to be heard.

8      MR. SAFRAN:  Thank you, Your Honor.

9      THE COURT:  Okay.  Why don't I hear from you first,

10  Mr. Conway, since you're asking for a downward departure or a

11  non-guideline sentence.

12      MR. CONWAY:  Would Your Honor like me to talk about

13  sentencing or restitution or how to merge them?

14      THE COURT:  You can address all of it however you

15  want to address it first.

16      MR. CONWAY:  Thank you, Your Honor.  I think my

17  argument in terms of restitution is simple in terms of what

18  I'm going to state so I'll start with that.

19      THE COURT:  Okay.

20      MR. CONWAY:  I fully understand that the Probation

21  Department and the government and Mr. Safran believe that the

22  existing partners of KinPit Associates are entitled to

23  restitution herein.  I beg to differ for the following reason,

24  the count of conviction -- I have a twofold argument, Your

25  Honor; one is the count of conviction charged Mr. Stevens with

16

1   a bank fraud.  The victim of that bank fraud was Capital One

2   Bank, it might have been Bank America at one time but it's

3   Capital One now or vice versa.

4           THE COURT:  North Fork Bank I believe.

5           MR. CONWAY:  North Fork.  They have been completely

6   paid off and that happened recently when they received a check

7   from the sale of KinPit Associates by the partners.  So, my

8   argument is that the victim in Count Two, I believe it is

9   Capital One and they were paid off.  To the extent that the

10  Court would find that KinPit was actually a victim of that

11  count, my argument would be this, Judge, is that they filed a

12  civil suit against Mr. Stevens, that civil suit was settled on

13  September 13th of this year with Mr. Stevens turning over his

14  50 percent share of KinPit Associates.  KinPit was set up when

15  Mr. Stevens had 50 percent and the other limited partners

16  combined owned 50 percent.  In that settlement Mr. Stevens

17  gave up his 50 percent.  Once that was done, the partnership

18  then went out and sold the partnership for slightly over ten

19  million dollars.  They were able to do that given the fact

20  that Mr. Stevens forfeited his 50 percent share which

21  mathematically would come out under the sale price of about

22  $5,175,000.  That money was then used to pay off Capital One.

23          I understand their argument that they were defrauded

24  here as well.  I don't know if it goes to the count of

25  conviction because he wasn't charged with defrauding the

1  partnership, he was charged with defrauding the bank and as

2  such, even if they are the victim, they got their remedy in

3  civil court and they got 50 percent of the shares that

4  Mr. Stevens owned.  Those shares were then sold for in excess

5  of ten million dollars or the combined 100 percent was sold in

6  excess of ten million, 50 percent of that would come out to a

7  little over five million and that was the money used.

8          THE COURT:  But their argument is that they would

9  not have owed Capital One anything but for the fact that the

10 defendant through fraud, through his misconduct, through his

11 fabrication of a partnership agreement that was materially

12 false upon which the bank relied to give these mortgages; if I

13 read the letter that Mr. Safran submitted correctly, and he'll

14 have a chance to correct me later if I'm wrong, the bank

15 relied on these fraudulent documents to issue the mortgages

16 and the partnership would not have been out the five million

17 dollars it had to pay to Capital One and, as the government

18 accurately points out, under the Crime Victims Act, under 18

19 USC Section 3664(j)(1), because the partnership paid the loss

20 to the initial victim here, Capital One, they have to be made

21 whole much like an insurance company that acts to indemnify

22 another entity for loss, that insurance company is then

23 entitled to go after the person who caused the loss.  And all

24 of this loss was proximately caused by the defendant's illegal

25 conduct.

18

1          MR. CONWAY:  We don't dispute for a moment the

2    defendant's illegal conduct, that's what he pled guilty to.

3    My argument, Judge, is they have their remedy

4    restitution-wise, they sued him, they got a settlement from

5    him where he turned over his 50 percent shares which totalled

6    over five million dollars.  They've already been made whole,

7    that's my argument.

8          THE COURT:  No, they haven't been made whole.  They

9    have not been made whole, you know, because, on the one hand,

10   you argue that, well, the defendant also had 50 percent of the

11   loss because he was a 50 percent partner but he settled up and

12   gave the partnership his 50 percent, so there goes his part of

13   the loss which goes to them; the point being, if I read the

14   partners' letters correctly, they stood in a position where

15   they had a favorable loan from the city or from the state that

16   was amortized over a period of 25 years at a very favorable

17   interest rate, probably far lower than anything that Capital

18   One was charging, I forget what the exact interest rate was,

19   one point something, I don't remember what it was.  In any

20   event, it was a favorable interest rate which they were on the

21   verge of or had already paid off, in which case they would

22   have been able to comfortably from the rents of the property

23   and the subsidies provided through Section 8 federal funding

24   to have paid whatever taxes were owed to the state and the

25   city and the feds, whatever they may have been, keep up the

19

1    maintenance and be comfortable themselves.

2            Instead, and it doesn't sound like they were

3    interested in selling this property, and given how Brooklyn

4    is the up and coming place, I wouldn't want to sell it either

5    if I was them; instead, they found themselves sued by Capital

6    One in federal court which they settled, that's why Capital

7    One got the settlement that they got.  They incurred legal

8    fees by having to deal with that lawsuit.  They incurred

9    additional fees by having to sell the properties, all of which

10   they hadn't planned on and all of which they found themselves

11   in a position of having to do because of the defendant's

12   illegal conduct.  I don't understand what your argument is in

13   connection with the applicability of 3664(j)(1), I don't.

14           MR. CONWAY:  My argument, Your Honor, in regards to

15   that section -- look, I could be wrong but I think it is very

16   simple, the partners who are claiming restitution now owned 50

17   percent of that partnership, they were then given a total of

18   100 percent and then were able to sell it and paid off the

19   loan and make a profit.  They made a profit of five million.

20           THE COURT:  They would have had a profit of ten

21   million dollars had they not --

22           MR. CONWAY:  They would not have.

23           THE COURT:  -- had to have paid off Capital One.

24           MR. CONWAY:  Not if Mr. Stevens didn't give them his

25   50 percent in the civil settlement they would not have.  If

1   they sold the property today and he didn't settle the case and

2   they sold it for ten million, their share would have been five

3   million, his share would have been five million.  He gave them

4   his share in a civil settlement, he said here's my five

5   million dollars, that's my argument, and that money was used

6   to pay off Capital One.

7           THE COURT:  There's a problem with that and that is

8   that the defendant benefitted from these fraudulent loans that

9   he obtained because he got the money.

10          MR. CONWAY:  He didn't get all the money, Your

11  Honor.  Most of the money went back into the partnership and

12  he drew a salary and took money out of the partnership but the

13  loan money, most of it went back to fix up the building.  They

14  both got a benefit from it.

15          THE COURT:  Let me hear from the government with

16  respect to these arguments.

17          MR. COFFEY:  The government respectfully disagrees

18  that the money went back into the buildings.  The clear

19  tracing of the money shows that he wrote himself checks to a

20  sum of a substantial six figure sum.  Whether any of the money

21  from the loan went into the building, we've never traced it to

22  that extent.  What we did trace is that substantial six figure

23  amounts went to him.  For example, out of that first loan of

24  two plus million dollars there is a check issued to

25  Mr. Stevens personally for one million dollars.  The money

21

1   goes into an operating account and then comes out, launders

2   through either him directly through the operating account over

3   the years or to another company that he controlled and then

4   went to him.  So, we haven't traced whether every dollar of

5   the loan money went into the building but certainly a

6   substantial amount went to Mr. Stevens.

7          Also, some of the money that was from the loan

8   proceeds went to pay -- clearly are personal expenses of

9   Mr. Stevens, his American Express card, and some of the items

10  on the American Express card on their face do not appear to be

11  for upkeep or maintenance on the building, they appear to be

12  restaurants and things of that nature.  So, he did benefit

13  from the loan proceeds personally and that's the thrust of the

14  government's argument.

15         THE COURT:  What about the argument that the

16  partnership received his portion of the partnership and thus

17  had an extra 50 percent that they would not have had

18  otherwise?

19         That is your argument, right?

20         MR. CONWAY:  Correct, Your Honor.

21         MR. COFFEY:  They still had to pay off that loan

22  which they never would have had to do.  Whether they reached

23  some kind of accommodation with him over what to do with his

24  50 percent, they would never have had to have been put in that

25  position except for or but for the fraudulent loans.  So, it

22

1   wasn't an act of generosity on his part, it was an act of

2   desperation to get out from under the bank possibly lowering

3   the boom and possibly taking those properties through

4   foreclosure.

5          THE COURT:  Why don't you address the sentencing --

6   just one second before you do that.

7          (Pause.)

8          THE COURT:  Why don't you proceed to the sentencing

9   factors.

10          MR. CONWAY:  All right, Your Honor.  Thank you.

11   Just two seconds just to follow up on what Mr. Coffey said, I

12   don't want anybody to get the wrong impression, we're not

13   saying we settled with KinPit out of generosity, Judge.  It

14   was a strategic decision to turn over the 50 percent to them

15   because we knew we committed a crime and eventually we were

16   going to have to pay one way or another.  We paid it in terms

17   of the settlement certainly thinking that we wouldn't have to

18   pay restitution since we gave them his shares in the

19   settlement, so we didn't do it out of generosity.

20          And, Your Honor, we're not saying he didn't get any

21   of the money, that's why we're sitting here today.  He clearly

22   got money and he clearly did it in an illegal fashion, that's

23   why we're here, that's why he pled guilty and accepted

24   responsibility for doing so, but there's also reports that are

25   filed with the city called J51-s that when loans are taken,

23

1  monies go into that building, it is state requirements. Did

2  he get some money out of these loans, absolutely, but so did

3  the partnership, Your Honor, and that's where I come out.

4          Turning to sentencing itself --

5          THE COURT: Where are those J51 filings?

6          MR. COFFEY: I'm sorry?

7          THE COURT: Where are those J51 filings?

8          MR. COFFEY: I'd have to check with the agent. I

9  haven't seen them.

10          THE COURT: This goes to the city?

11          MR. CONWAY: I believe they're filed with the --

12          THE COURT: Or the state?

13          MR. CONWAY: -- with the City of New York.

14          (Pause while counsel confers with the defendant.)

15          MR. CONWAY: They go to the City of New York.

16          THE COURT: I may want to have the parties provide

17  some additional submissions as to how much of the loans went

18  to -- I'm sorry, how much of the loans went into the property,

19  went into operating costs and so on, and you may want to be

20  careful because if he lied to the city, that's a separate

21  crime. If false representations were made to the city as to

22  how much loan was taken out and how much was put into the

23  property and how much was used may be subjecting yourself to

24  further liability. We'll talk about that more later.

25          I want to hear from Mr. Safran later on.

24

1        But, in any event, let me hear about the sentencing

2    factors.

3        MR. CONWAY:  Thank you, Your Honor.  I appreciate

4    the Court has received and read our sentencing memorandum.  I

5    will do my best not to try to repeat it verbatim but I don't

6    think there's any question, Judge, for just about anybody

7    sitting in this room, especially yourself, sentencing is

8    probably one of the most difficult proceedings in the court

9    system today.

10        Before you today is a 76 year old man facing his

11    first brush with the law.  He's done much good in his life but

12    he sits here now very much a broken man, a shell of the person

13    he once was.  Family-wise, as the Court knows, he's currently

14    married to his wife, she could not actually bear to be here,

15    he did not want her to see this, so she's not present in court

16    today.  He has a 15 year old daughter who stayed home with her

17    mother.  He has an ex-wife who I guess in today's day and age

18    speaks very well of her ex-husband and they were married for

19    30 years.  She's present in court today.  As the Court is well

20    aware, they have two children; Michele, who is present in the

21    courtroom today, and he has a daughter named Dawn who

22    unfortunately suffers from bipolar and is currently

23    institutionalized.  And, lastly, with his current wife he has

24    a stepdaughter named Stephanie who is also here as well.

25        He has no siblings, as the presentence report

1   states.  His siblings, unfortunately, died at early ages and

2   he hasn't had any siblings in quite sometime.

3          Most of the people I just mentioned, Judge, as I

4   said are present but they also took the time to write you a

5   letter and I appreciate the Court having read those letters.

6   The letters all describe him basically in the same manner, a

7   hard working, decent, loving person who's always willing to

8   help others out.  Now, I won't focus on Troy more than his

9   family.  Mr. Stevens wrote a letter to the Court, I believe it

10  is three pages in length, I think that gives a fairly good

11  indication of who Troy Stevens was growing up, he was working,

12  and maybe even gives some explanation as to how he got in this

13  position today.

14         As it states, Your Honor, he started working from

15  the early age of eight years old when he had a paper route.

16  In fact, he had a second paper route added on when he was ten

17  years old and at age 12 he was finding himself as a caddie in

18  a local golf course over in Hempstead or the Rockville Centre

19  area.  He ended up dropping out of high school and went to

20  work for his dad's construction company.  That wasn't

21  something that was a passion to him at the time, and he then

22  went into the recording business for several years.

23         When that didn't work out or it wasn't something he

24  was really driven to do, he went back to the construction

25  industry and at that point really made an effort to better

1   himself and to do a better job to support his family.  He took

2   some college technical courses and he got a job at Blitman

3   Construction and soon realized that construction was his

4   passion.  He enrolled at the School of Design and took

5   engineering, plumbing, steel and electrical design courses and

6   after he was done with that he ended up starting his own

7   company which specialized in residential rehabilitation

8   projects in poor communities.

9           His company was able to complete numerous projects

10  in those poor communities such as helping build a library, a

11  post office, a firehouse, a church, among other projects.

12          THE COURT:  I find it very interesting that in the

13  interview that he had with Probation he had difficulty

14  recalling details concerning his employment with respect to

15  these construction projects.  There was no mention of any of

16  this additional training that he received, these college

17  courses that he took, none of that is mentioned to Probation.

18          MR. CONWAY:  Your Honor, as in my experience,

19  Probation, you know, did a very good job here as they always

20  do but it's difficult in, you know, a one hour meeting to

21  convey everything you've done over your life especially when a

22  lot of these things I'm talking about go back to the 1950's

23  and the 1960's.

24          So, in terms of having specifics or even having, you

25  know, photographs or anything, we just -- it's difficult to

1    bring things that happened back in the '50's and the '60's but

2    Mr. Stevens will address the Court, he will tell you --

3            THE COURT:  Well, he had no problem putting them

4    down in a letter.  The probation interview is scheduled in

5    advance --

6            MR. CONWAY:  It is and you know --

7            THE COURT:  -- and he's represented by counsel at

8    the interview, so presumably he's aware of what to expect.

9            MR. CONWAY:  Yes, and he provided a work history

10   that he had his own business for, you know, for a period of

11   time back in the '50's and '60's.  In terms of getting ready

12   for sentencing as to what he wants to tell the Court, he sat

13   down over many, many nights, if not weeks trying to

14   reconstruct his life and this is what he came up with.  It is

15   far easier to do something like that as opposed to sitting

16   with the Probation Department for an hour or so.

17           His association with KinPit, Judge, goes all the way

18   back I believe to 1972, so we're talking, you know, that's 40

19   years ago.  His own business predates that which is, you know,

20   40 to 50 years ago, so it's a very lengthy period of time.

21   You know, he did that business for a period of time but then

22   he went into what he's done for the last 40 years which is

23   housing project management.  He started that back in 1972.

24           THE COURT:  He says in his own letter on the first

25   page, he says:  Two years later through different jobs and

1  also working with my father in construction I saved enough

2  money to go into the recording business but after a few years

3  I realized it wasn't my passion, construction would be my

4  future, I enrolled at Farmingdale Technical College where I

5  took night classes in any area of construction they offered.

6          He didn't tell Probation anything about that.

7  Probation didn't have the opportunity verify that in any way.

8          Then he goes on to say:  I got a job with Blitman

9  Construction right away and was promoted two months later.  I

10  was then contacted by an engineering company and offered a job

11  no passionate construction worker could resist, to work on the

12  World Trade Center.  Thanks to DIC Concrete and the Tishman

13  organization I worked with the greatest engineers, architects

14  and designers, it was a dream come true.  I took advantage of

15  the opportunity to enroll in Bautista School of Design and

16  studied engineering, plumbing, steel and electrical design.

17          Again, none of that was told to Probation.  I think

18  I would remember if I worked on the World Trade Center.

19          MR. CONWAY:  You know, Your Honor, if you think

20  Mr. Stevens is lying, then that's one thing but I understand

21  it wasn't told to Probation but you have to understand he goes

22  to Probation for a one hour meeting, he's asked for ten

23  minutes about his work history.  Now when he's getting ready

24  for sentencing and he wants the Court to know more about him,

25  he sits down over the course of a month and writes a letter.

1   If you want to criticize me for not being able to do that

2   beforehand and giving it to Probation, so be it but that's how

3   it happened.  I don't understand why you're having trouble

4   believing that that is what he did.

5              THE COURT:  You don't understand?

6              MR. CONWAY:  I don't.  If you want to adjourn --

7              THE COURT:  Ms. Bryant.

8              MR. CONWAY:  It is 60 years ago, Your Honor.

9              THE COURT:  Ms. Bryant.

10             PROBATION OFFICER:  Your Honor, for the record, the

11  interview was far longer than one hour.  I asked in depth

12  questions to help jar his memory concerning his educational

13  and work history and what I have are notes here from said

14  interview and there was no mention -- specifically with

15  education, how far along did he go in school, he never

16  finished the 12th grade.

17             MR. CONWAY:  Right.

18             PROBATION OFFICER:  There is no mention of schooling

19  beyond the 12th grade.  And after that we discussed his

20  employment history and it was difficult for him to remember

21  specific events from before Dawmich and St. Johns.  It was

22  extremely difficult for him to give me details.  There was

23  no mention -- again, this is for the record today -- of

24  Tisch (sic) or employment at World Trade Center.  Those two

25  are memorable places of employment.

1           Of course, everything is written here, if you'd like

2  to take a look at my notes, you're certainly welcome to do so.

3           I've had instances through no fault of the defendant

4  where they're unable to remember certain events that happened

5  in their employment background and I've had attorneys present

6  information to me after the interview to clarify or to

7  supplement what was provided during the interview and that's

8  noted in the presentence report and the following addenda.

9  So, it is not uncommon for defendants to not remember but in

10  instances where there are gaps, there's important information

11  missing, I've had attorneys send me information after the

12  fact.

13           THE COURT:  And I have certainly had the experience

14  of having addenda submitted to the presentence report where

15  additional supplemental information about schooling, about

16  marriages, about relationships, medical history, psychiatric

17  history, work history, all of that is provided by defense

18  counsel after the fact because sometimes, yes, it's true that

19  certain things are not remembered at the moment and there was

20  an ample opportunity here for the time to object and none of

21  this was submitted.

22           So, yes, I have a hard time discerning whether this

23  is simply puffery on his part or whether this really happened.

24           MR. CONWAY:  Well, if that's the case, Your Honor, I

25  would ask for an adjournment so we can attempt to go back 50

1    years and provide some things.

2         And I wasn't saying anything negative about

3    Probation, Judge.  He is 76 years old, he has very

4    difficult -- as he sits here now trying to answer some of your

5    questions, he has difficulty remembering things.  Once he sat

6    down and we forced him to sit down and sit down with his

7    ex-wife and try to remember some things, this is the letter he

8    came up with.  Should we have tried to give it to Probation,

9    yeah, okay, we should have, but the report was already out and

10   we didn't.

11        If you think it is puffery, then I'm going to ask

12   for an adjournment so we can try to document some things that

13   happened 50 years okay.  Blitman is not there anymore.  We'll

14   try to get records that he took technical courses 50 or 60

15   years ago, we'll attempt to do that.

16        THE COURT:  I'm not really appreciating the somewhat

17   facetious tone that you're using with the Court.

18        MR. CONWAY:  Well, I got to tell you, Judge, I don't

19   appreciate the Court telling me that my client is lying to the

20   Court right now because that would never happen in my lifetime

21   and if that's the allegation you're making, then I'm as upset

22   as you are.

23        THE COURT:  What I am telling you is that I have

24   some difficulty in taking those two things and resolving

25   inconsistencies that appear from the record and that's part of

32

1    my job is to consider the entire record.

2              MR. CONWAY:  Absolutely, Your Honor.

3              THE COURT:  And if you don't like that, then that's

4    too bad.

5              MR. CONWAY:  It's not that I don't like it, Your

6    Honor, but when my client is being accused of possibly lying

7    to the Court, that's an exception I take.

8              THE COURT:  Well, your exception is noted.  If you

9    have other things to say, go ahead.

10             MR. CONWAY:  I think at this point, Your Honor, I

11   don't think it's -- you know, there's much else to say.

12             THE COURT:  I'm not precluding you from saying

13   anything else.

14             MR. CONWAY:  I would ask for an adjournment to be

15   able to document these things.

16             THE COURT:  You just insinuated that there is no way

17   to document it.

18             MR. CONWAY:  Well, I can certainly try.

19             THE COURT:  Companies are gone, it's 50 years ago.

20   All of this could have been done in advance and you could have

21   asked for an adjournment back before we all sat down here and

22   took time out of our day to do this, because I'm not the only

23   one that's reading this, you all are reading this and the

24   inconsistencies should be apparent to anyone who reads this.

25             MR. CONWAY:  Judge, there's no inconsistencies here.

33

1          THE COURT:  I'm not doing anything special here.

2          MR. CONWAY:  Judge, there's no --

3          THE COURT:  I'm just asking a question about all of

4    this.

5          MR. CONWAY:  You made an accusation, Judge, that's

6    one, and there's no inconsistencies, all right.  The man said

7    he had a work history, that he worked for himself, he was in

8    the recording business, that's all documented in the

9    presentence report.  What's not in the presentence report is

10   that he went back and remembered he took some technical

11   classes and he did this and did a couple of things like that

12   which is no way anybody can document and if you think he's

13   sitting here lying, then I've got to take issue with that.

14         THE COURT:  Then your exception is noted.

15         MR. CONWAY:  Okay.

16         THE COURT:  Anything else?

17         MR. CONWAY:  Yes, Judge, there's a lot more to say.

18         THE COURT:  Then go ahead.

19         MR. CONWAY:  In 1972, Judge, he starts his housing

20   management and that's what he's done for the last 40 years.

21   And it wasn't up until the year 2000 that he started having

22   some issues when in some extraordinarily bad judgment he went

23   to apply for these loans thinking that he was going to help

24   the building and help the tenants.  There's no question he

25   helped himself as well but a lot of that money did go back.

34

1        He's done nothing in the last 40 years but to try to

2    better the tenants that are in that housing project, the

3    Section 8 people.  He's been to work every single day.  He's

4    always at the housing project.  He's always trying to make

5    life better for the residents there in terms of fixing up the

6    projects, fixing up individuals' homes and things of that

7    nature.

8        Now, at the age of 76 after a lifetime of hard work

9    he finds himself financially ruined from which he's never

10   going to recover.  He's lost his partnership in KinPit.  He's

11   going to lose his partnership in St. Johns to pay off the

12   other debts that he has.  He's about to lose his home to

13   foreclosure and he finds himself destitute with a wife and a

14   15 year old daughter that somehow he's going to try to

15   support.

16       He has some health issues, thank God nothing major,

17   but he does suffer from diabetes, high blood pressure.  A lot

18   of these things are controllable but at the age of 76, you

19   know, nobody can be too sure as to the severity of these

20   medical conditions.

21       I don't think Mr. Stevens poses a threat to the

22   public.  I don't think society needs to be protected from him.

23   I think the chance of any recidivism here is remote.  I think

24   this represents an aberrant diversion from an otherwise very

25   good law abiding life.  He's lost everything.

35

1          THE COURT:  It's not aberrant behavior in the sense

2    that that term is used in connection with federal sentencing

3    because it's not aberrant behavior, it's not a one time

4    incident, it's not one loan that we're talking about, it's not

5    one tax year that we're talking about, we're talking about a

6    course of conduct over a substantial period of time.  So, it's

7    not aberrant conduct and it's conduct that he engaged in

8    already as an older person, as an adult, as an adult over the

9    age of 60 and so, you know, when you start talking about risk

10   of recidivism, all the charts and the studies, they go out the

11   window, because they studies are based on people who get

12   started with their criminal history at a younger age and how

13   that risk of recidivism goes down as they get older but it

14   doesn't really account for people who engage in criminal

15   conduct once they are doing it as an older adult and over a

16   period of time, a long period of time, up until, what, age 74,

17   73.

18          MR. CONWAY:  I use the word aberrant, Your Honor, in

19   the sense that he's 76 years old, this was a five year period

20   of a 76 year old life where the other 71 years seemed to be

21   very, very good.  That's the only reason I used that word.

22   He's now lost everything and any hope that he has to recover

23   is completely out the window and his only hope as he sits here

24   is that he doesn't have to die in prison alone.

25          We're not claiming in any way, shape or form he

1 doesn't deserve to be punished, we're only arguing the

2 severity of such punishment.  I know the guidelines are

3 advisory, I know the Court will take them into consideration

4 in deciding a sentence.  The only argument I made in my papers

5 earlier, Judge, is we don't contest the loss to Capital One or

6 whoever may be the victim, we don't contest the numbers, the

7 guidelines are exactly what the presentence report comes out

8 to be but the guidelines are basically made up in large part

9 of that four or five million dollars, and I know we have a

10 difference of opinion here where I think everybody has been

11 made whole, I understand the Court differs with that.  My only

12 point on that issue is two-thirds of the guidelines are made

13 up on this loss number which in my eyes has been paid back.  I

14 understand the Court might order additional restitution but

15 that's my argument as to that.

16           We're asking that the Court simply craft a sentence

17 that allows him to see his family again and to benefit and do

18 something good for society in his remaining years.

19           THE COURT:  Thank you.

20           For the government?

21           MR. COFFEY:  Yes, Your Honor.  With respect to his

22 family situation, he has not pointed to anything extraordinary

23 or unusual.  Terms of imprisonment are always going to have an

24 impact on an individual's family and it is only to the extent

25 that they are extraordinary or unusual that the guidelines

1    would even look into a situation and he has not pointed to

2    anything extraordinary or unusual.

3            THE COURT:  That's true under a traditional

4    guideline analysis but in the post-Booker world the Court has

5    to consider the 3553(a) factors, not just the advisory

6    guidelines and the law both coming from the Supreme Court and

7    the Second Circuit seems pretty clear on that issue, that no

8    one factor needs to be extraordinary, that it can be the full

9    nature and circumstances, all of the factors taken into

10   consideration that could create a situation that warrants a

11   variance even perhaps including some factors that

12   traditionally under a strict guideline analysis could not be

13   taken into consideration such as age, for example.

14           MR. COFFEY:  I acknowledge Your Honor's pointing

15   that out and that's correct.  The only thing is in the 3553 it

16   also points to the seriousness of the offense and that here is

17   the impact it had on the financial institution and on his

18   partners.  That money is lost somewhere, whether it's the bank

19   or the partners, somebody got money they weren't entitled to,

20   it's lost, it's gone, it's spent and it shouldn't have been

21   and the point is if he was legitimately taking out loans,

22   first of all, he should have gotten his partners' approval,

23   which he did not, and, secondly, those loan proceeds should

24   have been shared or at least his partners should have had a

25   say on how they were to be expended, whether they were to be

38

1   shared among the partnership, whether they were to be spent

2   all on the building's maintenance or somewhere in between.  He

3   repeatedly over six loans signed false documents saying he had

4   the consent of his partners and presented them or caused them

5   to be presented to the bank.  It was a conscious and

6   deliberate pattern of behavior.  It's not something that he

7   just overlooked once; six times, it occurred on six separate

8   loans over a number of years.  That money should have been

9   shared with the partnership so they could decide among

10  themselves how to spend it, not he made the sole decision, not

11  he wrote a million dollar check to himself, not that he

12  decided to use some of the money to pay his American Express

13  bill.

14          So, that money went somewhere.  It doesn't --

15  whether it's the bank that's the victim or the partnership

16  that's the victim, it's more important to focus on where did

17  that money go.  It went to him and the partners had no say on

18  how that money was supposed to be spent, the loan money.

19          So, I think that the seriousness of the offense

20  outweighs anything under 3553, any of the other considerations

21  because of the impact it had, serious impact it had on the

22  bank who was deceived and gave out money that they put at risk

23  and only because of the partners stepping up and paying off

24  the bank, the bank would still be at risk and still would have

25  lost the money and now the partners have lost that money.

1  It's not a question of partners were made whole or would be

2  made whole or that the bank was made whole, it's that

3  Mr. Stevens made himself whole by taking that money and he had

4  no permission or authority to do so.

5          So, I would otherwise stand on my submissions to the

6  court, Your Honor.

7          THE COURT:  Thank you.

8          Mr. Stevens -- I'm sorry, you want to consult with

9  your attorney?

10          THE DEFENDANT:  Yes.

11          THE COURT:  You may go ahead.)

12          (Pause.)

13          MR. CONWAY:  Thank you, Your Honor.

14          THE COURT:  Yes.  So, Mr. Stevens, you have a right,

15  as I said earlier, to make a statement to the Court and if you

16  wish, I'll give you that opportunity now.

17          THE DEFENDANT:  Yeah, I appreciate that.  I have a

18  little problem with my throat sometimes, I go to say something

19  but allergies, it doesn't come out.

20          THE COURT:  Just take your time.

21          THE DEFENDANT:  I appreciate that.

22          THE COURT:  Take your time.

23          THE DEFENDANT:  I'm sitting here, you know, I feel

24  very sad about what happened, the wrong that happened and I'll

25  get back to that in a little while.  It went along here, it

1    seemed as they're retrying this case again.  If that's the

2    case, I could bring vouchers into you proving all the work we

3    did on the building, okay.  And one lucky thing I have here,

4    actually we talked about it, is my wife, my ex-wife is here,

5    she worked in the basement back when Michele was born, working

6    in the basement, working there with the payroll when we first

7    started in business, that's many years ago, and I was packing

8    papers up --

9              THE COURT:  Address yourself to the Court.

10             THE DEFENDANT:  I'm sorry, ma'am.

11             THE COURT:  Okay.  Just take your time, take your

12   time.

13             THE DEFENDANT:  Yeah.  I think I remember now.  She

14   was with me 30 years ago.  We did the payrolls in the basement

15   of my parents' home, okay, our office was there.  As a matter

16   of fact, the New York Times did an article, it was in that

17   letter, which somebody had investigated, there was a picture

18   they had in the New York Times about the work I did going back

19   to 1974.  Also there was another article in the Daily News as

20   well about Pitkin Avenue, the project we're talking about,

21   that was the thing, I developed the whole project.  And it

22   came out that I was a contractor, okay.  We get some old

23   records from City of New York, it would show I was the

24   contractor on the projects.  I did government work, okay, the

25   post office; I've built post offices, I've built fire houses.

41

1  She remembers better than I do.  When I say "she," I'm

2  pointing at my ex-wife, Mattie.  She knows because she remind

3  me of things.

4        I was in the recording business at one time.  Too

5  bad Frankie Lymon wasn't still here, I knew him personally,

6  that's a singer.

7        THE COURT:  I'm sorry, I couldn't hear the last

8  thing that you said.  Could we maybe turn up the volume on his

9  microphone.

10        You're speaking softly, I wasn't able to hear the

11  last thing that you said.  I'm sorry, could you just repeat

12  it.

13        THE DEFENDANT:  Going back to --

14        THE COURT:  To the recording industry, I missed

15  that.

16        THE DEFENDANT:  Yes.  I said too bad it is so long

17  ago because you heard of Frankie Lymon, I was a very good

18  friend of his.

19        THE COURT:  I know who Frankie Lymon is.

20        THE DEFENDANT:  Pepitones, Johnny and Joe I

21  recorded.  They go back many years.  I can't bring somebody

22  forward here to say here's Johnny and Joe or here's Johnny,

23  did you work with Troy, did you work with Troy, yeah, he was

24  the manager for a period of time.  Frankie Lymon, the same

25  way, okay.

1          So, when it got construed as lies I'm telling, if we

2   had time we could go to newspapers and prove the articles that

3   were written on me, a picture in the New York Times, okay.

4   And my wife back there, she would verify the exact same thing,

5   okay.  And the work I did at Wyatt Tee Walker Baptist Church,

6   I put an escalator in for them up in the church many years

7   ago.  Some of the members are still around, I may go up there

8   and talk to them, they may remember me, okay.  Most of them

9   are passed on now, okay.

10          So, in the World Trade Center, okay, I worked there.

11   I had a picture at the house there standing on top of tubes

12   going to New Jersey.  I was one of the engineers and trying

13   with my boss, he was helping me a lot.  I worked with Tishman

14   people, I stated in the letter, you work with the best in the

15   world in construction.  If you look it up, maybe it is on the

16   internet someplace.  I was the office engineer.  I also worked

17   as a carpenter in the field with my father.  For somebody to

18   tell me that there's no records, just ask me for it.

19          Last thing, I wanted to thank you, Your Honor, the

20   judge, for allowing me to speak, I appreciate that.

21          THE COURT:  You have to slow down because the

22   reporter is not hearing you and I'm having trouble hearing you

23   as well, if you could just slow down a little bit and speak

24   directly into the mike.

25          THE DEFENDANT:  Okay.

1        THE COURT:  It's that you're speaking a little too

2    fast.

3        THE DEFENDANT:  Okay.  Thank you, Your Honor.

4        THE COURT:  Just slow down.  I know you're nervous,

5    just relax.

6        THE DEFENDANT:  So, I feel very strong the things I

7    accomplished in my life.  When we had the interview she did it

8    by format, she didn't let me speak myself.  I told Joe, Joe,

9    she kept cutting me off.  There's a lot of things I

10   remembered, I couldn't tell her, that's what I just went over

11   a little while ago.  I can prove that with letters and the New

12   York Times article.

13       I really want to say to the Court that what

14   happened, you know how sorry, how ashamed I am.  Can you

15   imagine my family sitting back there looking at me up there,

16   you know how I must feel.  It is something I did badly, I'm

17   sorry for it.  You know, that's what I can say, you know, like

18   my 15 year old, 16 year old daughter one day will find out

19   that daddy is incarcerated, where is he.  She'll find out

20   sooner than that, she's a very bright kid.

21       I was hoping that the Court have mercy on me, not

22   send me to incarceration and I'll repay society, be better to

23   society than I have so far and that's all I have to say.

24   That's what I wanted to get across on my credibility and about

25   how sorry I am.  If you realize how sad I am, every night I go

1   to bed I can't sleep, my wife can't sleep, she cries half the

2   night.  My little baby, Dawn, who is in the hospital,

3   Creedmoor, she's so happy to see me.  She said, oh, daddy, are

4   you coming to see me, you're coming.  I'll miss all that.

5            I hope you have mercy on me as a person and that if

6   you check into what I just told you, the work I did, you'll

7   find I'm telling the truth.  Thank you, Your Honor.

8            THE COURT:  Okay.  Thank you.

9            Mr. Safran, I indicated that I would give you an

10  opportunity to be heard.  Why don't you come up here because,

11  as you can hear, that sometimes it is hard to hear people from

12  up here.  You can sit across from Mr. Coffey here.

13           Just make sure, Mr. Coffey, his microphone is on.

14           MR. SAFRAN:  Thank you, Your Honor.

15           THE COURT:  If we could just get, once you get

16  settled in, your full name for the record please.

17           MR. SAFRAN:  May I sit?

18           THE COURT:  Yes, please.

19           MR. SAFRAN:  The first time I was in federal court,

20  Your Honor, I didn't know which table to sit at.

21           THE COURT:  That's okay, I didn't know where to

22  stand the first time that I went to court either so.

23           MR. SAFRAN:  If the Court please, my name is

24  Edward B. Safran.  I'm an attorney admitted to practice in the

25  State of New York and my office is located at 88 Pine Street

1    in Manhattan on the 7th floor.  I am here on behalf of my

2    eight clients.

3           I have no personal interest here.  I do have five

4    years of having lived litigation representing my eight clients

5    during which time I've had opportunities to depose Mr. Stevens

6    I believe on five full days and meet with him in court with

7    his attorneys and deal with a very difficult contentious

8    litigation.  I think there was some in excess of 20 motions

9    filed in that case.

10          I'm representing today, I'm here on behalf of Harold

11   Garber, Dr. Harold Garber, Ronald Seiden, Seymour Nash, Robert

12   Magoon, Gordon Miller, Stephen Kulvin, K-U-L-V-I-N, Steven

13   Zaron, Z-A-R-O-N, and Lee Dufner, D, as in David, U-F-N-E-R.

14          These eight gentlemen, seven of whom are physicians,

15   one is a businessman, live in Florida.  Mr. Magoon I believe

16   lives in Colorado at the present time, but back in 1975 they

17   were all Florida residents and seven of the eight of them were

18   practicing medicine and the other was a businessman in a

19   family business.

20          Dr. Nash is a urologist, for instance, Dr. Magoon

21   was an ophthalmologist, I don't recall the specialties, but

22   they were all physicians, each of whom worked with his hands

23   and with his time to earn a living.  None of these fellows ran

24   an equity fund, they didn't make money on other people's

25   money.  They worked hard to make money.  They looked to invest

46

1   whatever they were able to invest to put away money for their

2   old age, that was in 1975.  Fortunately they're all alive,

3   most of them are in their late 70's or 80's.  None of them

4   could be here today for a variety of reasons, one of course

5   being that one never knows when this proceeding is going to

6   happen, so they asked me to speak on their behalf and they

7   asked me to recount some of the knowledge that I gained

8   representing them in dealing with Mr. Stevens in the civil

9   litigation.

10         Listening to the proceedings today, this Court is

11   fully aware, in my eyes, of what went on.  I think Your

12   Honor got it, Your Honor understands what went on, what

13   Mr. Stevens' participation in this partnership was all about.

14   I don't want to be too redundant but I'd like to start at the

15   beginning.  1975, my clients were approached by their

16   accountant with an opportunity to make an investment which

17   they thought would do good because this was an investment that

18   was promoted by the United States government by giving what

19   they call an accelerated depreciation if they would invest

20   money in housing for the poor and that's what they did here.

21         Mr. Stevens, we learned through our depositions, had

22   already owned the building or five merged buildings on Pitkin

23   Avenue, he had bought them some years before, and Mr. Stevens

24   was made aware of a program that Mayor Lindsay had instituted

25   in the City of New York to finance housing for the poor.  And

1  Mr. Stevens was able to take advantage of that and I believe,

2  as he had told us during his deposition testimony, his was the

3  last such program that the City of New York was able to fund

4  and my clients had invested $360,000 in 1975.  In 1975 I think

5  a Cadillac was selling for about $5,000, Your Honor, it gives

6  you an idea of where the value of money is or was, because in

7  1975 and then again in 1978 or 1979 we had those two Arab oil

8  embargoes, the value of money absolutely changed in the United

9  States with huge inflation.  Your Honor is not going to

10  remember this but I do, we had 18 percent to 21 percent

11  interest and the value of the dollar shrunk.

12          So, $360,000 when we talk about it today doesn't

13  sound like so much but it's the equivalent in today's dollars,

14  in my opinion, of somewhere between two and a half and three

15  and a half million dollars, and that was their investment here

16  and they invested in good faith in a project on Pitkin Avenue

17  in Brooklyn in a building that was owned by Mr. Stevens which

18  was then sold to the partnership and the partnership received

19  the investment from my clients and used that investment to buy

20  the building from Mr. Stevens.  So, he was made whole right

21  away.

22          Mr. Stevens then was able on behalf of the

23  partnership to borrow money under that city program that Mayor

24  Lindsay had started and I believe it was about 1.4 or 1.5

25  million dollars, which was an awful lot of money again in

48

1    1975, and that money was used to rehabilitate the buildings so

2    that people could actually live there.

3            Mr. Stevens had his own company, a company called

4    UniTroy.  I think he made mention before that he had started

5    in the construction business with his dad and either he and

6    his dad or he himself at that time was the sole owner of

7    UniTroy and they did all the work and the entire 1.4 or 1.5

8    million dollars in reconstruction and rehabilitation costs of

9    this building went to Mr. Stevens' company, UniTroy, right at

10   that time.

11           And then the building was rented out and that was

12   not a difficult proposition because the government subsidized

13   the rents.  We have a population in Brooklyn that needed this

14   kind of housing and this was a relatively successful

15   enterprise with government subsidized rents, there was

16   virtually no vacancies.  So, we have roughly 90 apartments and

17   five stores that were probably always if not 100 percent

18   occupied, 98 percent occupied and the cash flow was always

19   there.

20           My clients had never met Mr. Stevens and Mr. Stevens

21   testified at deposition in the civil case that he had never

22   met or spoken with any of my clients before the litigation in

23   New York County State Supreme Court, never met them, never

24   spoke to them except he also never sent them any of their

25   money.

1        Back in the mid-1990's my clients complained that

2    you're not notifying us, you're not sending us reports, they

3    hired a law firm in New York.  Mr. Stevens promised to do

4    better.  Well, he sent them some reports from time to time but

5    that ended and it wasn't until shortly before 2005, maybe

6    2004, that Mr. Stevens made a mistake and the mistake was

7    rather than just send my clients the annual K-1 which is a one

8    page document that discusses profits and loss of the

9    partnership so that my clients could file their tax returns,

10    he also sent them a copy of the partnership return and, guess

11    what, they saw that he had refinanced the building and

12    borrowed money even though that was prohibited, he had never

13    told them that, he had never shared it with them.  In fact, he

14    never sent them five cents in distributions from day one up

15    until that time, up until today he's never distributed any

16    funds to my clients although they invested their hard earned

17    money.

18        So, in 2005 these gentlemen from Florida came to me

19    and asked me to look into it and litigate so that their

20    interests could be protected and the litigation was one that

21    went on till 2012.  It was met with resistance at every point.

22    We conducted enormous depositions of Mr. Stevens who

23    testified.  Mr. Stevens was untruthful.  He was untruthful

24    about certain basic facts which was surprising.  The most

25    glaring untruth was his denial of the fact as to the

1   authenticity of the partnership agreement.

2          Now, he took this partnership agreement to the North

3   Fork Bank in the year 2000 and when questioned about that --

4   because the partnership (sic) he took to North Fork Bank in

5   the year 2000 was a forgery, it was a forgery to the extent

6   that he deleted, whited out or did a photocopy trick the

7   provision that said thou shalt not refinance this building

8   without 51 percent of the limited partners' consent.  That

9   didn't appear in the document he gave to the bank.  So, what

10  did he say about that, well, he continuously denied that that

11  was the accurate agreement until we located in the archives of

12  the County Clerk's Office of New York County a 1979 lawsuit in

13  which Mr. Stevens signed an affidavit authenticating the very

14  contract that he forged.  That was the beginning of the end of

15  that litigation.

16         We then received summary judgment on the issue of

17  liability but, more than that, his acts, his breach of

18  fiduciary duties, his fraud on a federally chartered bank

19  resulted in what I in my 49 years at the bar found

20  extraordinary, the New York County Supreme Court stripped him

21  of his right to be a general partner.  So, they not only put

22  the building in receivership because there was -- you know,

23  the bank was trying to foreclose on it and no longer would the

24  court permit Mr. Stevens to continue in management of it, but

25  after a second motion was made later on when we found out

1   other information, they took away his right to be general

2   partner.

3            I'm sitting here today, Your Honor, and listening to

4   the fact that, well, this is a victimless crime.  This is not

5   a victimless crime.  Mr. Stevens by the use of his fraud of

6   the North Fork Bank received $5,313,142 directly from the bank

7   but in order to get that money it cost another $424,997 in

8   costs, whether it be brokerage fees or the points or whatever

9   else the bank charged.

10           In addition to that, what we're all forgetting about

11  is that when you borrow money, you're actually only renting

12  money, so another $3,195,222 was spent in interest on money

13  that my clients never saw and, to round it all out, Your

14  Honor, another $93,854 was spent in late fees, bank charges

15  and the bank attorney's fees as a condition of avoiding

16  foreclosure.

17           So, we have $9,027,215 that the partnership was

18  out-of-pocket over and above everything else he may have

19  diverted.  This is money that my clients expected over and

20  above their interest in the real estate because if he didn't

21  borrow the 5.3 million dollars, as Your Honor noted earlier,

22  we wouldn't have incurred the $424,000 fee in order to borrow

23  that money, we wouldn't have had to pay almost 3.2 million

24  dollars in interest, and we wouldn't have had to pay another

25  94,000 almost in fees for the foreclosure on a loan that never

1    should have been taken in the first place.

2          What happened to that money.  I'm sitting here and

3    I'm listening that a lot of work was done on the building and

4    maybe some of that money went back into the building.  I don't

5    know what the record in this criminal case is like, Your

6    Honor.  Today is the first day I'm here, today is the first

7    day I'm meeting the Assistant U.S. Attorney, I think I spoke

8    to him twice and maybe met one of their investigators three or

9    four times over the course of time, but Mr. Stevens was unable

10   to document in five years of litigation, the tens of thousands

11   of reams of discovery documents, he was unable to document any

12   of the work that he did allegedly to maintain the building.

13         First of all, every dollar that was collected by

14   rents in that building was sent to a company either called

15   KinPit Realty, which is his operating company, or Dawmich, 100

16   percent owned by Mr. Stevens, and this was the only building

17   that I've ever come across, Your Honor, 90 stories -- 90

18   apartments, walk-up, not an elevator building so we didn't

19   have that expense, this is the only building that didn't have

20   a live-in super.

21         What he did was everything that had to be spent for

22   that building he allegedly did through Dawmich, this company

23   that supposedly maintained and managed the building but

24   unfortunately he was unable to show what it is that he did in

25   the civil litigation.  He didn't have backup invoices, he

1   didn't have support that he had bought materials, and to the

2   extent he did produce invoices, Your Honor, they were all

3   self-serving which he prepared at home, according to his own

4   testimony, three, four or five months after the fact.  It was

5   sad.

6           And whatever he charged the partnership for

7   so-called maintenance, there was never a comparable out there,

8   it's not as if he went and at least found XYZ plumbing

9   company, they would charge $25 for this, therefore, he was

10  charging $25.  No, he made it up, he said I know the

11  construction industry and I know what's fair and that was the

12  basis of him charging the partnership money.

13          There's been some comments about the settlement

14  agreement.  There was a stipulation of settlement.  Nobody

15  wants to go to trial.  We learned in our own investigations

16  that although Mr. Stevens owned I don't remember how many

17  acres but a lovely home with a tennis court and a swimming

18  pool in Muttontown, New York, that it was pretty heavily

19  mortgaged.  We couldn't find assets.  So, you know, there's a

20  strategic decision that a lawyer has to make with his clients,

21  are we going to spend more money chasing nothing or are we

22  going to do the best we can and see if we could settle this

23  case and that's what happened here, Your Honor.

24          The building was sold for about ten million dollars.

25  The bank was paid whatever, roughly four and a half million

1   plus, but on top of that, that nine million that I'm talking

2   about my clients never saw and I understand that because this

3   is a bank fraud case my testimony should only show what the

4   approximate result of the bank fraud was, not other frauds,

5   not other misdeeds so I didn't prepare myself for that, Your

6   Honor, so I'm strictly focusing on the flow of money, 5.3

7   million plus three million dollars in interest and so on that

8   would have come into the partnership but went elsewhere.

9          And this wasn't such an expensive building, as I

10  mentioned before, Your Honor.  I mean I visited once or twice,

11  it was a walk-up.  You know, these are poor people who live in

12  that building, it's not the best place in the world.  I mean I

13  do remember seeing shells on the roof and, you know, crack

14  cocaine vials on the roof.  Not a terribly maintained

15  building, nothing that I would want my kids to live in.

16         I don't know what other kind of information could be

17  helpful to the Court or if the Court has any questions of me.

18  I do know that in listening to Mr. Stevens talk before, I can

19  tell you that I don't remember -- I'm not -- I don't want to

20  be a guarantor of this but I don't remember him mentioning

21  when he gave us his background and I went into it very deeply

22  at the deposition, I don't remember Farmingdale College, I

23  don't remember the World Trade Center.  I do remember Blitman,

24  I do remember UniTroy.

25         I think -- and I empathize, I have to tell you, Your

1    Honor, going into this litigation years ago meeting

2    Mr. Stevens, he was personable, tennis player, had a great

3    handshake, and I told him that whichever way this lawsuit

4    turns out, there was no notion in my mind of criminality at

5    that time, to me this was an accounting case, you know, you

6    have a partnership, you've got to account to your partners,

7    and I told him I was proud of him because when I grew up, and

8    I grew up in Brooklyn, I didn't know any African Americans and

9    that's not a term we used when I grew up, but I didn't know

10   any African Americans that owned land, I didn't know any

11   African Americans that owned their own construction company,

12   and when he testified that he had I believe an eighth grade

13   education and testified to some of his background at

14   deposition, I'll tell you I had a lump in my throat.  We are

15   all immigrants, we all come from different, you know,

16   difficult places when we come into New York, it's a unique

17   city, and to do good here, to do better here is not easy and

18   particularly for African Americans in that point in time it

19   was tough and I told him I'm proud of you.

20           But when I started to learn that he wasn't being

21   truthful even about the authenticity of a partnership

22   agreement, why are you fighting about that, you signed

23   affidavits that are filed in court attesting to the

24   authenticity of the agreement, why are you now telling us in

25   2007 or 2008 when I had him in deposition, oh, that's not my

1  signature or that's not the agreement that I signed.  What's

2  going on here.  And there was never any answer to why he went

3  back to the well at North Fork six times.  I mean, you know,

4  how much -- you get away with a little.  In the year 2000 he

5  took himself, you know, he wrote a check right away right

6  after the closing, when I say the closing, the mortgage

7  closing, he took a check for a million dollars.  I asked him,

8  what was that all about.  Well, he said the partnership owed

9  me money.  Oh, really, when did they incur that debt.  He

10  said, well, before they owned the property in 1973, 1974 when

11  UniTroy was rehabbing the property, it should have been

12  another million dollars.  This is what he told me about what

13  he took in the year 2000.

14         My clients are unhappy.  My clients worked hard for

15  their money.  They expected a fairly reasonable return on

16  their money over the years.  They didn't expect to have to

17  spend three-quarters of a million dollars in litigation for

18  seven years, that's not what they bought into, and when they

19  invested their money, they expected that some of that money

20  would be long-term and now that they're in their late 70's and

21  their 80's the money would be helpful.  Nine million dollars,

22  Your Honor, over and above, over and above what they netted

23  out on the sale.

24         If the Court has any questions, I'll be glad to

25  answer them.

1      THE COURT:  I have no questions now but what I

2  would appreciate from the parties, and I may include you in

3  this, Mr. Safran, is because there has been raised some

4  argument about the fact that at least a portion of the loans

5  were put back into the properties, right, so to a certain

6  degree that would be a benefit to the parties and there are

7  some cases that say that there can't be restitution at least

8  to the amount that there was a benefit to the partnership,

9  right, because if the monies go to making the properties

10  better, then there's a benefit, right, to the partnership.

11      I agree with Probation, even with the submissions

12  that came after the last addendum from Probation, there were a

13  lot of figures that were thrown out there, there were some

14  issues that were raised by the defense as to what went into

15  the civil court settlement, the fact that the defendant gave

16  up his share, I'm not sure what that means that he gave up his

17  50 percent share.  There is, on the one hand, the argument was

18  made in the document that was submitted late today, on the one

19  hand, that the defendant too suffered a loss being part and

20  parcel of the partnership in connection with what was expended

21  for the mortgages but then, on the other hand, he argues that

22  as part of the civil settlement that he gave his 50 percent

23  share to the partners and so the partners have been enriched

24  by that 50 percent share and, therefore, his portion of any

25  profit that he would get.

1          I would like to get some supplement from the

2     parties, from all the parties.  I will, in fact, vacate my

3     order striking, Mr. Conway, your submission from today.  I'll

4     enter that order when I get back to the office so that we can

5     all give some due consideration to the arguments that were

6     raised there.  If you wish, Mr. Conway, I don't think it's

7     necessary but to the extent that you want to supplement the

8     record with anything that your client has that substantiates

9     his prior work or education history, if he has it, because the

10    reality is that what's at issue here is what happened in the

11    last ten years or so, a little more than ten years, the past

12    13 years in connection with the bank fraud and the tax fraud

13    which hasn't even been addressed at all today because there's

14    restitution that's owed there as well to the federal

15    government.

16          It was mentioned by the defense about these J51

17    forms that supposedly documents money that's supposed to go

18    into the building.  Somebody must have a record of those

19    forms.  If they have to be filed by the city or filed with the

20    city, excuse me, then presumably the city must have some of

21    these forms available at least going back the ten years that

22    are at issue here, the 13 years that are at issue here, to

23    substantiate it.

24          Now, I don't know how the Section 8 funding works

25    and what that money is supposed to go to and whether that is

1    money that is supposed to go towards maintenance or whatever

2    other costs there may be in maintaining the building.  I

3    assume that maybe payment of utilities, I don't know if these

4    are apartments -- I'm assuming these are apartments that there

5    is a flat rent that is paid by the occupants, by the tenants

6    and there's no cost to them as to utilities.  So, presumably

7    there's gas and electric bills that maybe the Section 8

8    funding which I assume is the federal funding, correct?

9              MR. COFFEY:  Yes.

10             THE COURT:  So, I'm not sure how that was applied

11   here and if there are records about that that relate to this,

12   and I would like to be able to consider this.  So, because the

13   defendant has asked for some time to be able to supplement the

14   record, I was prepared to go forward with the full sentencing

15   today and then hold off on the restitution because, again,

16   these cases present a great difficulty not only just for the

17   human factor but also because there is a money judgment here

18   that has to be made and the defense is wrong that the partners

19   are not victims here, the partners are victims here because

20   they did make Capital One whole and I think it does fall under

21   3664(j)(1) of Title 18 of the United States Code, I'm not

22   convinced by defendant's arguments, but the question is how

23   much restitution is owed and, of course, the Court is mindful

24   that the restitution that is owed has to relate to the count

25   of conviction which is the bank fraud.

60

1          So, unfortunately, there may be, Mr. Safran, all

2    these other costs that you talk about that were a loss to the

3    partners overall, unless there is a proximate cause between

4    the bank fraud and the partners' loss, then the Court is

5    constrained by that.  Obviously -- yes, sir?

6          MR. SAFRAN:  Just so that it doesn't get lost, Your

7    Honor, over the course of roughly the years 2000 to 2012 the

8    building had rental income and this is over and above the

9    proceeds of the loans.  The rental income of the building over

10   the course of time averaged about a million dollars a year,

11   maybe a little bit more.  So, you know, there was plenty of

12   cash coming into this enterprise, so it's on top of that

13   rental income that we now have the loan proceeds.

14         In addressing myself to the Court and the numbers

15   that I used to the Court, I strictly addressed myself to the

16   principal borrowed, the points or the costs involved in

17   borrowing that money, the interest paid on that money and the

18   bank charges to avoid foreclosure and to pay off the money and

19   that was the nine million dollars.  Nothing else.  There was

20   more, Your Honor, believe me.

21         THE COURT:  No, I understand and that is a good

22   point, I am aware of the fact that there had to be some rental

23   income because the tenants were paying rent.  There's no

24   allegation here that the tenants were not paying rent.  So,

25   and I'm assuming that what is paid by the tenants is in

1    addition to whatever funds are coming from the federal

2    government for the Section 8 funding, so that's in addition to

3    whatever the federal funds are and then I don't know what the

4    cost of running the buildings are but I think all of those

5    things are relevant to determine whether or not, as the

6    defense claims, that some of these loans were poured back into

7    the properties that were owned collectively by the partnership

8    because I'm sure, as in most frauds, as I see in most fraud

9    cases, it's so interesting when you look at these fraud cases,

10   at the end of the day when you're here in court the assets are

11   in thin air, they're gone.  Why?  Because these are people who

12   want to live the high life, live in mansions they can't afford

13   and drive cars that they can't afford and treat people to

14   tennis trips like one of the letters talked about.  It's easy

15   to be generous on money that's not yours.

16          But I think these are important issues that the

17   Court needs to take into consideration to come to a proper

18   amount for restitution and, as I said earlier, Mr. Conway, I

19   don't know whether you're going to find documentation or not

20   but you have your opportunity to submit it along with the

21   submission here and I'm going to make it a simultaneous

22   briefing schedule so I'll get something from the defense and

23   from the government at the same time since you both are aware

24   of what the other's position is.

25          Can I have -- well, it may take a while to put these

1    documents together given the length of time.

2         How is January 6 for the initial submission?  Is

3    that -- taking into consideration the holiday season.

4         MR. COFFEY:  Yes, Your Honor.

5         THE COURT:  Is that enough time?

6         MR. CONWAY:  Yes, Your Honor.

7         THE COURT:  Okay.  And then reply, I'll give you

8    three weeks, January 27th.

9         And Mr. Safran, I know that perhaps there is

10   something in the records that you have from the civil

11   litigation that might be pertinent, I don't know what records

12   may have surfaced in the course of that litigation, I imagine

13   you must have a room full of documents or close to.

14        MR. SAFRAN:  They're in storage, Your Honor.

15        THE COURT:  Mostly because state court -- did you

16   subpoena the state court documents?

17        MR. COFFEY:  We subpoenaed a lot of them, Your

18   Honor.  I don't believe I got a room full but I did get a lot

19   of documents.

20        MR. SAFRAN:  Whatever the government wants I'll give

21   them if I have it.

22        THE COURT:  Okay.  So, perhaps, just to make it not

23   to tax Mr. Safran and his clients, if you can see if there's

24   anything you think that there might be in the state court

25   records.

63

1          MR. COFFEY:  Yes.

2          MR. SAFRAN:  I'm going to ask that that be done

3    sooner rather than later.  I'm going away for my 50th

4    anniversary at Christmas.

5          THE COURT:  Congratulations.

6          MR. COFFEY:  I'll get on it right away.

7          THE COURT:  We'll put this on then -- I expect to be

8    on trial for a good part of February.

9          How is February 19th for the parties?

10          MR. COFFEY:  Yes.

11          THE COURT:  And I have the full day open.  Is

12    morning better or is the afternoon better?

13          MR. COFFEY:  Mornings are good for the government,

14    Your Honor.

15          MR. CONWAY:  That's fine, Your Honor.

16          THE COURT:  Morning, how is ten o'clock?

17          MR. COFFEY:  Yes.

18          MR. CONWAY:  Fine.

19          THE COURT:  Okay.  So, that's February 19th at ten

20    o'clock.  That will be for sentencing and for the Court to

21    determine restitution.

22          Please copy Probation on the documents as well so

23    that they have a chance for input.

24          And would you have enough time, Ms. Bryant, to give

25    me something say by February 7th?

64

1          PROBATION OFFICER:  That is fine, Your Honor.

2          THE COURT:  Okay.

3          Please remember to send hard courtesy copies to

4  chambers.

5          MR. COFFEY:  Yes, Your Honor.

6          THE COURT:  All right.  Thank you all very much.  I

7  appreciate your time.

8          MR. CONWAY:  Thank you, Judge.  Thanks for the

9  opportunity.

10          MR. SAFRAN:  Thank you, Your Honor.

11          (Time noted:  4:35 p.m.)

12          (Proceedings adjourned as above set forth.)

13

14

15

16

17

18

19

20

21

22

23

24

25